# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:10-CR-161 |
| | ) | |
| MAIMOUNE WRIGHT, | ) | (VARLAN/SHIRLEY) |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case came before the Court on September 26, 2011, for an evidentiary hearing on the Defendant's pending motions, including her Motion to Suppress Defendant Wright's Statements Regarding Pre-signed Prescriptions [Doc. 64], filed on August 1, 2011. Assistant United States Attorney Alexandra Hui appeared on behalf of the Government. Attorney Michael H. Meares represented Defendant Wright, who was also present.[1] The parties presented testimony and argument on the pending motion, which the Court took under advisement at the conclusion of the hearing.

---

[1]Attorneys Michael B. Menefee and Christopher Scott Irwin appeared on behalf of Defendants Tamral Guzman and Brian Downey respectively. Defendants Guzman and Downey were not present at the hearing and have not joined in this motion.

1

# I. POSITIONS OF THE PARTIES

The Second Superseding Indictment [Doc. 56] charges, in pertinent part, Defendants Wright and Guzman with engaging in a conspiracy to dispense controlled substances outside the usual course of medical practice and without a legitimate medical purpose from August 2008 to December 7, 2010. Defendant Wright moves [Doc. 64] for the suppression of statements that she gave on October 29, November 5, and November 25, 2009, arguing that law enforcement officers failed to advise her of her Miranda rights in violation of the Fifth Amendment. She contends that on each of the three occasions that she was questioned, she was in custody and the interrogating agents knew that she faced potential criminal liability. Additionally, the Defendant asserts that her statements were involuntarily given because the interviews were psychologically overbearing.

The Government responds [Doc. 78] that Defendant Wright was not subject to custodial interrogation at the time she gave statements and, thus, the Miranda warnings were not required. It also argues that no police coercion was involved in the interviews, so the Defendant's statements were not involuntarily given.

# II. SUMMARY OF THE TESTIMONY

The Government presented the testimony of Drug Enforcement Administration (DEA) Diversion Investigator David Graham and Tennessee Health-Related Boards Investigator Betty Houser.

DEA Diversion Investigator David Graham testified that his job involves investigating the process by which pharmaceutical drugs become street drugs. He stated that diversion investigators do not make arrests, carry firearms, interview confidential sources, or conduct

2

surveillance. He stated that he first met the Defendant in December 2008, when he went to the newly-opened Maryville Pain Management clinic at the request of owner Tammy Guzman to answer questions about record keeping and procedural compliance. At that time, he learned that the Defendant was employed at Maryville Pain Management. Investigator Graham interviewed the Defendant fifteen to twenty times over the next couple of years with regard to an investigation into her former employer. He stated that the Defendant was not a subject of that investigation involving her prior employer and that he intended to use her as an expert witness in that case. He stated that during this time, he spoke with the Defendant at least monthly and that she sometimes called his office to provide information.

Investigator Graham stated that in October 2009, Melvin Viney, a new nurse practitioner at Maryville Pain Management, contacted him with concerns about the prescription practices at the clinic. Mr. Viney told him that Viney had replaced the Defendant, who was no longer working at Maryville Pain Management. Mr. Viney reported that when he reviewed the patient files, he noticed that prescriptions had been issued in the Defendant's name during a two-to-three-week period in which no medical practitioner worked at the clinic. Mr. Viney related that after talking with patients, he learned that Tammy Guzman had issued these prescriptions. Mr. Viney believed that the prescriptions had been forged. Investigator Graham testified that on October 28, 2009, Mr. Viney came to speak with him about these issues and brought five or six patient files containing examples of the potentially forged prescriptions.

Investigator Graham testified that upon viewing the patient files that Mr. Viney brought, he could not discern anything unusual about the files and he believed the signature on the prescriptions looked to be the Defendant's, so he sought to clarify when the Defendant left the

3

Maryville Pain Management clinic. Investigator Graham stated that he called the Defendant and asked her to meet with him at his office on October 29, 2009. According to Investigator Graham, he did not order the Defendant to meet with him or threaten her, and she willingly agreed to the meeting. On October 29, 2009, Investigator Graham met with the Defendant and Mr. Viney in the DEA conference room. Investigator Graham was not carrying a firearm at this meeting. He introduced the Defendant and Mr. Viney, told them the purpose of the meeting, and then listened while they reviewed the patient files and discussed their concerns. Investigator Graham stated that the meeting lasted about one hour, that neither the Defendant nor Mr. Viney were restrained in any way, that they were both free to leave, and that no one was arrested at the conclusion of the meeting. He testified that at that time, he believed the Defendant to be a complainant in a forgery investigation. He stated that the Defendant speaks fluent English and had no difficulty understanding him on that day. He observed that he had never had difficulty communicating with the Defendant.

Investigator Graham testified that a few days after the meeting on October 29, Mr. Viney showed him additional medical records. Also, the Defendant had given him a copy of a letter, which stated that her termination date at Maryville Pain Management was September 28, 2009. Investigator Graham stated that he did not know if the Defendant had actually left on the stated date, because the letter was written after the fact. He stated that at this time he believed that the Defendant had confused the date that she left Maryville Pain Management and that she had actually seen the patients whose files Mr. Viney had shown him. He thought that he needed to speak with the Defendant again and contacted her to set up an appointment. He denied that the Defendant told him that she would not speak with him if Investigator Betty Houser was present.

4

Investigator Graham stated that on November 5, 2009, he and Investigator Betty Houser arrived at the Defendant's clinic on Sutherland Avenue between 9:00 and 9:30 a.m. In addition to the Defendant and her office staff, a number of patients were present in the clinic's waiting room. Investigator Graham told the Defendant in a calm and matter-of-fact tone that they wanted to discuss the forgery allegations with her. The Defendant "was fine with that." [Doc. 99, p.20] Investigator Graham was wearing a coat and tie and was not carrying a firearm that morning. The Defendant was busy but led Investigators Graham and Houser to her office. Investigator Graham and Investigator Houser sat in two chairs in front of the Defendant's desk, while the Defendant sat behind her desk. Investigator Graham stated that neither he nor Investigator Houser blocked access to the office door and that the Defendant was free to leave the room. The Defendant left the room and returned several times during the meeting, presumably to see patients or handle other clinic business, without asking for permission from Investigator Graham. Investigator Graham testified that neither he nor Investigator Houser ordered the Defendant to unplug her telephone. He denied making any racist remarks during the meeting. According to Investigator Graham, the purpose of the meeting was to resolve the discrepancy between the dates on the prescriptions and the date the Defendant left Maryville Pain Management. He said the meeting lasted about one hour and that the Defendant never requested an attorney during the hearing. He stated that if the Defendant had asked for an attorney, he would have stopped the investigation for lack of a complainant. The Defendant was not a target of his investigation at this point.

Investigator Graham testified that during the course of the November 5th meeting, the Defendant examined the prescriptions and stated that most of them did bear her signature. The Defendant was not sure whether a couple of the signatures were hers or not. Investigator Graham

5

told the Defendant that an individual's signature can have minor variations depending upon whether the person was rushing, standing or sitting, fatigued, etc. To illustrate this, he had the Defendant sign her name on a piece of paper numerous times, and he highlighted the variations. This paper was entered as Exhibit 1. Investigator Graham said at the meeting, the Defendant stated that she had previously signed blank prescriptions and given them to Tammy Guzman for the purpose of issuing them to patients on days when the Defendant was not there. The Defendant believed that Ms. Guzman had stockpiled these signed blank prescriptions. Investigator Graham said that he was stunned by this information from the Defendant and that he had never considered this to be a possibility. Investigator Graham stated that the meeting ended on cordial terms and that the Defendant was not arrested at the end of the meeting.

Investigator Graham testified that following his November 5 meeting with the Defendant, he met with Tammy Guzman at the Maryville Pain Management clinic. While there, he seized a large quantity of drugs to which Ms. Guzman had no legal entitlement. He stated that some of the drugs had been purchased using the Defendant's DEA registration number. Investigator Graham said that Ms. Guzman claimed the drugs had been abandoned.

Investigator Graham stated that he and Investigator Houser went to the Defendant's clinic and met with her again on November 25, 2009, in order to determine whether the Defendant knew Ms. Guzman had purchased drugs using the Defendant's DEA number. Investigator Graham did not recall if they had an appointment on that day, but he stated that his relationship with the Defendant was such that he could have arrived unannounced. The Defendant, her office staff, and patients were present when he arrived. He characterized both his and the Defendant's tone as cordial. Investigator Graham testified that as before, he was wearing a coat and tie and did not carry

a firearm. He stated that he did not order the Defendant to meet with him or threaten her. Investigator Graham said that he, Investigator Houser, and the Defendant went to the Defendant's office to meet. He and Investigator Houser sat in the same two chairs, and the Defendant sat behind her desk again. He said they did not move their chairs or block the door. He stated that the Defendant was free to leave and did come and go in tending to the operation of the clinic. Investigator Graham said the Defendant was not ordered to unplug her telephone and that this meeting lasted about two hours.

Investigator Graham testified that at the November 25th meeting, he discussed the controlled substances found at Maryville Pain Management, which had been ordered using the Defendant's DEA registration number. The Defendant disavowed any knowledge of those orders and indicated that Ms. Guzman had placed the orders without her knowledge. The Defendant presented information that she had obtained from the state advisory prescription program relating to patient misconduct. Computer and printing problems extended the length of the meeting. The Defendant never asked them to leave or asked for an attorney. The Defendant was not arrested at the conclusion of the meeting, and the investigators and the Defendant parted on cordial terms.

On cross-examination, Investigator Graham testified that Tammy Guzman was not a DEA registrant but that at her request, he answered her questions about record keeping and security around the time she opened Maryville Pain Management. He stated that he considered both Mr. Viney and the Defendant to be complainants in his investigation, because it was the Defendant's signature that was allegedly forged. Although he did not expressly recall the conversation, he agreed that the Defendant likely called him on September 25, 2009, stating that she was resigning from Maryville Pain Management and to ask his advice regarding drugs kept there. He stated that while

7

drugs could be kept at the clinic, the question was whether they were there legitimately. Investigator Graham believed that he told the Defendant to send her complaints to him in writing. Investigator Graham testified that he did not recall whether he was aware that the Defendant's supervising physician and a second physician working at Maryville Pain Management also resigned shortly after the Defendant.

Investigator Graham testified that he spoke on the telephone with Mr. Viney on October 28, 2009, and then met with him later that day. He met with Mr. Viney again the following day, October 29, 2009, and then met with Mr. Viney a third time a few days later. He called the Defendant and asked her to meet with him on October 29th. The Defendant did not ask him if she needed an attorney in that telephone call. At the October 29th meeting, the Defendant took the position that her signature on the prescriptions was forged. No handwriting analysis was performed on the prescriptions. Investigator Graham did not recall if the Defendant called him between the October 29th meeting and the November 5th meeting, but he stated that she did not tell him that she did not want to meet with him if Investigator Houser was present. Before the November 5th meeting, Investigator Graham believed that the Defendant had signed the prescriptions but that she had been working at the clinic at the time.

Investigator Graham stated that at the November 5th meeting, the Defendant stated that she had signed the prescriptions. The Defendant signed an affidavit that memorialized the statement she gave on that day. This affidavit was entered as Exhibit 2 to the hearing. The affidavit states that the Defendant did not authorize the issuance of the attached prescriptions from September and October 2009. The affidavit does not state that she pre-signed these prescriptions. Investigator Graham prepared a report [Exhibit 3] of the November 5th meeting. The report relates that the

8

Defendant stated she was having medical issues that prevented her from coming to the clinic, so she pre-signed blank prescriptions and gave them to Ms. Guzman, who was suppose to issue them to patients on the days the Defendant was not at the clinic.

Investigator Graham further testified on cross-examination that he did not give Miranda warnings to the Defendant at the November 5th meeting. He stated that he and Investigator Houser may have arrived at the Defendant's new clinic unannounced. When they arrived at the clinic, the waiting room was fairly full and contained about fifteen patients. Investigator Graham spoke to the Defendant briefly in the waiting room and then interviewed her in her office. He did not recall whether he suggested that they meet in her office. He agreed that he and Investigator Houser were seated between the Defendant and the door to her office, but he did not recall rolling his chair toward the door. He did not suggest that the Defendant unplug her telephone during the meeting. The November 5th meeting lasted about one hour and had many interruptions. Investigator Graham did not recall asking the Defendant who her supervising physician was. He denied commenting on the ethnic background of her supervising physicians or threatening that she would be practicing in India if her license was taken away. Investigator Graham stated that the affidavit that the Defendant signed during the November 5th meeting was produced by the state Health-Related Board and was typed prior to the meeting, although he did not know by whom. He denied that the Defendant was emotional or "visibly shaken" by the end of the meeting. He stated that he did not ask the Defendant to look up any information on her computer at the November 5th meeting. He reiterated that his purpose in meeting with the Defendant that day was to determine whether her signatures on the prescriptions provided by Mr. Viney were forged.

9

Investigator Graham stated that he asked Investigator Houser to accompany him to the Defendant's clinic on November 5th because he and Investigator Houser have similar missions and because he needed a partner to go with him. At that time, he did not know that Investigator Houser had investigated the Defendant on four other occasions. He stated that the Defendant did not appear to be afraid of Investigator Houser on November 5th. He did not recall Investigator Houser saying that the Defendant was the victim or that without the Defendant, there would be no investigation.

Investigator Graham testified that during the November 5th interview, the Defendant admitted that her signature was on some of the prescriptions from Mr. Viney but was unsure of whether it was her signature on a couple of the prescriptions. After that admission, Investigator Graham asked the Defendant to sign her name several times creating Exhibit 1. Investigator Graham testified that after the Defendant acknowledged her signature on the prescriptions and also stated that she had left Maryville Pain Management before the dates on the prescriptions, he asked her how both of these statements could be true. At that point in the interview, the Defendant had a "revelation" that these were the blank prescriptions that she had signed and given to Ms. Guzman. The Defendant stated that Ms. Guzman was not suppose to issue these prescriptions. Following this, the Defendant gave the dates that she had been absent from the clinic and estimated that she had pre-signed 250 or more blank prescriptions. She stated that she pre-signed prescriptions during the time that her mother was ill. Investigator Graham denied saying to the Defendant that he better not find any prescriptions with her signature on them when he went to the Maryville Pain Management clinic. He did not recall whether they discussed that there was a large quantity of controlled substances in the safe at Maryville Pain Management. He stated that he left the Defendant's clinic around 10:30

10

a.m.  He denied that the Defendant asked for an attorney at the November 5th meeting.  He also denied that he made any statements regarding the Defendant having to practice in India.

Investigator Betty Jean Houser testified that since 1996, she has worked as a registered public health nurse,  a consultant, and an investigator with the Tennessee Department of Health.  In this position, she has regulatory authority to investigate complaints against health care professionals.   She stated that she does not carry a firearm in the course of her employment or as a private citizen.  She explained that investigations are initiated when someone files a complaint with the central office.  The individual boards review the complaints and either assign them to an investigator or close the investigation.  Investigator Houser testified that if, during the course of an investigation, she became aware of a potential violation of a board rule or policy, she is required to report the violation to the Board of Consultants, the Office of General Counsel, and the Director of Investigations, who in turn would determine whether to authorize an investigation of that violation.

Investigator Houser stated that she had investigated prior complaints against the Defendant and that she first met the Defendant in 2007 or 2008.  In August 2009, her office received a complaint against the Maryville Pain Management clinic, and she was assigned to investigate that complaint but had not performed any investigation by October 2009.  In October 2009, DEA Investigator David Graham contacted her to assist him with an investigation of the issuing of prescriptions for controlled substances at the Maryville Pain Management clinic.  Investigator Houser stated that the Director of Investigation approved her participation in the investigation.  Investigator Graham told her that there were prescriptions signed by the Defendant that were issued after the Defendant had resigned from Maryville Pain Management.  She said upon hearing this information, she thought that the Defendant's identity may have been misused or her signature

11

forged.

Investigator Houser testified that on November 5 and 25, 2009, she met with the Defendant and Investigator Graham at the New Hope Pain Management clinic on Sutherland Avenue. The New Hope Pain Management clinic is owned by the Defendant. Investigator Houser stated that before the November 5th meeting, she attempted to call the Defendant at home to see if she was willing to share information about the potential forgeries. At this time, she believed the Defendant to be a fact witness. She said that she tried to called Defendant at home to preserve the Defendant's confidentiality and so that the staff would not know that an investigation was proceeding, but she was not able to reach the Defendant by telephone. She and Investigator Graham arrived at the New Hope Pain Management clinic between 9:30 and 10:00 a.m. on November 5th. Investigator Houser said that Investigator Graham had coordinated the interview. Upon entering the clinic, they asked to speak with the Defendant, who agreed to speak with them and embraced Investigator Houser. She described the tone of their request as polite, professional, and cordial, and stated that she was dressed in business attire and was not carrying a firearm.

Investigator Houser stated that the Defendant took her and Investigator Graham to her office. They sat in chairs across the desk from the Defendant. They did not move the chairs from their original location or block the door. Although no one asked the Defendant to unplug her telephone, the Defendant did it of her own accord. Investigator Houser testified that the Defendant was free to leave the room and did leave the room during the interview. While speaking with the Defendant, they showed her some documents. Investigator Houser denied that they made any racist remarks to the Defendant. The interview lasted about two hours, and the goal of the meeting was to gather information. During the interview, the Defendant admitted that during March, August, and

12

September, she had pre-signed at least 250 prescriptions for emergency use. The Defendant told them she did this when she was away from the office for health reasons and a death in the family. The Defendant arrived at the number of pre-signed prescriptions by estimating that she had signed a certain number of pads each containing fifty prescriptions. Investigator Houser said she was stunned and surprised when she learned this information. Immediately before this admission, Investigator Graham had asked the Defendant to sign her name a number of times, and Investigator Houser had tried to help her with an affidavit. She stated that during the entire interview, the Defendant did not request an attorney.

Investigator Houser testified that she prepared an affidavit on November 3, 2009, in order to assist the Defendant, who sometimes becomes anxious. At the time, Investigator Houser viewed the Defendant as someone whose identity had been misused and signature potentially forged. At the November 5th meeting, the Defendant swore to the affidavit before she admitted to pre-signing prescriptions. Investigator Houser stated that even after the admission, the Defendant still felt "victimized, because she did not authorize [D]efendant Guzman to use her identity or credentials." [Doc. 99, p.104] She explained that the Defendant did not view her admission and the statements in the affidavit to be mutually exclusive. She said that if the Defendant had asked for an attorney, they would have stopped the interview and left. Investigator Housser said that the Defendant was not arrested at the conclusion of the interview.

Investigator Houser stated that on November 25, 2009, she and Investigator Graham met with the Defendant again at the New Hope Pain Management clinic. Investigator Graham also coordinated the interview on this day, and he and Investigator Houser arrived together. Upon entering the clinic, Investigator Houser and Investigator Graham asked to speak with the Defendant

13

to review a DEA Form 222. Investigator Houser said that their tone, in making this request, was not threatening and that the Defendant willingly agreed to the meeting. The Defendant took the investigators to her office, where they sat across the desk from the Defendant. They did not move the chairs or block the door, and Investigator Houser stated that the Defendant was free to leave and did leave the room at one point. They did not ask her to unplug her telephone. Investigator Houser stated that she was not carrying a firearm during this interview, that no one made any racist remarks, and that the overall tone of the interview was professional and polite. The interview lasted less than two hours. The Defendant did not ask for an attorney during the interview and she was not arrested upon its conclusion. Investigator Houser stated that the investigators and the Defendant parted on cordial terms.

On cross-examination, Investigator Houser testified that Investigator Graham asked her to be a part of the investigation involving the Defendant on October 29, 2009, because a potential violation relating to prescribing controlled substances had occurred. She acknowledged that the central office received a complaint about the Defendant and Dr. Jethandani on August 7, 2009. Investigator Houser received the file on this complaint in September 2009 but did not begin working on it at that time due to her heavy workload. She stated that when Investigator Graham called her and asked her to participate in the interview, she told him she was assigned to an investigation of Maryville Pain Management clinic, but they did not talk about the focus of that investigation. Based upon her prior investigations of the Defendant, Investigator Houser knew that she tended to become anxious. Investigator Houser believed the Defendant was more anxious about Houser's part in the investigation than Investigator Graham's involvement because she is a nurse and because her office had the power to take away the Defendant's nursing license. Before the November 5th meeting,

14

Investigator Graham had told her that the Defendant was concerned about her involvement in the investigation.

Investigator Houser stated that on November 3rd, she prepared a general affidavit for the Defendant to sign because she believed the Defendant would deny that she had authorized the prescriptions in question. She acknowledged that the affidavit says nothing about the Defendant pre-signing prescriptions. When they arrived at the clinic, Investigator Graham asked the Defendant if they could meet in a private place. The Defendant unplugged the telephone in her office of her own initiative. Investigator Houser testified that the Defendant was not given the <u>Miranda</u> warnings at the November 5th meeting, nor was the meeting recorded. Investigator Houser asked the Defendant who was her supervising physician at New Hope Pain Management, and the Defendant told them it was Dr. Vijay Jethandani. The Defendant's supervising physician at Maryville Pain Management had been Dr. Arun Jethnandani. Investigator Houser said that Investigator Graham did not say, "If we take your license, you'll have to go to India to practice," or anything of that nature. She also said that Investigator Graham never made the statement that he had better not find anything with the Defendant's name on it at Maryville Pain Management when he next went there.

Investigator Houser testified that during the interview on November 5th, she questioned the Defendant about whether she was a victim. Investigator Houser stated that at that time, she believed that the Defendant trusted Ms. Guzman. The Defendant stated that she pre-signed prescriptions for emergency use when she had to be away from the clinic due to some orthopedic pain, when her mother was ill, and when there was a death in the family. After the Defendant's admission to pre-signing prescriptions, Investigator Houser did not create a new affidavit because the affidavit she had created on November 3 still fit with what the Defendant told them. The

Defendant felt that her credentials had been misused because the Defendant had not authorized the use of the pre-signed prescriptions after she left Maryville Pain Management. Investigator Houser said that the Defendant told them that she had tried to get Ms. Guzman to return the pre-signed prescriptions when she stopped working at Maryville Pain Management but that Ms. Guzman refused. Investigator Houser stated that the interview lasted about one hour and fifteen minutes. While the Defendant seemed anxious during the interview, Investigator Houser thought that the Defendant was glad to explain what had happened.

Investigator Houser stated that fewer than ten patients were in the waiting room when she arrived and ten to twelve patients were there when she left. The Defendant left the room at least twice during the November 5th meeting, but Investigator Houser did not know if she saw patients on these occasions. The Defendant had access to the door to her office each time.

### III. FINDINGS OF FACT

Based upon the evidence presented at the September 26 hearing, the Court makes the following factual findings:

On October 28, 2009, nurse practitioner Melvin Viney contacted DEA Diverson Investigator David Graham about potentially forged prescriptions at Maryville Pain Management clinic, at which he had recently began working. The Defendant had resigned from her position as a nurse practitioner at Maryville Pain Management at the end of September 2009, yet Mr. Viney found prescriptions, bearing the Defendant's signature, had been issued in the weeks between the Defendant's resignation and Mr. Viney's employment. Investigator Graham met with Mr. Viney that day, examined the prescriptions, and called the Defendant to arrange a meeting with her and Mr.

16

Viney on the following day.

On October 29, 2009, the Defendant came to the DEA office at Investigator Graham's request and met with him and Mr. Viney. Investigator Graham introduced the Defendant and Mr. Viney and listened while they discussed the prescriptions bearing the Defendant's signature that were issued after the Defendant's resignation. The Defendant believed that her signatures on the prescriptions in question had been forged. The meeting lasted approximately one hour.

A few days later, Mr. Viney provided additional medical records to Investigator Graham, also containing prescriptions bearing the Defendant's signature and issued following the date the Defendant said she had resigned. Believing that the Defendant was confused about the date that she left Maryville Pain Management, Investigator Graham decided that he needed to meet with the Defendant again and called her to schedule an appointment on November 5. Investigator Graham also contacted state regulatory Investigator Betty Houser and asked her to accompany him to this meeting with the Defendant. On November 3, 2009, Investigator Graham prepared an affidavit for the Defendant to sign at the November 5 meeting. The draft affidavit stated that the Defendant did not authorize the prescriptions issued from Maryville Pain Management in September and October 2009.

Between 9:00 and 10:00 a.m., on November 5, 2009, Investigator Graham and Investigator Houser met the Defendant at her new clinic New Hope Pain Management to resolve the discrepancy between the dates on the prescriptions and the date the Defendant left Maryville Pain Management and to determine whether the Defendant's signature on the prescriptions had been forged. The Defendant led them to her office, where she sat behind her desk and the investigators sat in two chairs opposite her desk. The Defendant voluntarily unplugged the telephone so that they

17

would not be interrupted. The investigators were not blocking the Defendant's access to the office door, and the Defendant left several times during the interview to attend to clinic business.

The <u>Miranda</u> warnings were not given at the November 5th meeting. During the meeting, the Defendant examined the prescriptions and agreed that most of them bore her signature, rather than a forgery. The Defendant was not sure whether the signatures on a couple of the prescriptions were hers or not. Investigator Graham asked the Defendant to sign her name on a piece of paper multiple times to illustrate that ones signature can have minor variations. At that point, the Defendant stated that while working at Maryville Pain Management, she had pre-signed 250 blank prescriptions and left them with the clinic owner Tammy Guzman to be used in emergency situations when the Defendant was out of the office. Although the Defendant had asked Ms. Guzman to return any pre-signed prescriptions when she resigned from the clinic, Ms. Guzman had not done so. The Defendant said she believed that Ms. Guzman had stockpiled the prescriptions and then issued them without the Defendant's authorization after the Defendant resigned.

During the course of the November 5th interview and before she told the investigators that she had pre-signed prescriptions, the Defendant signed an affidavit stating that she did not authorize the issuance of prescriptions from Maryville Pain Management in September and October 2009. After her admission, the Defendant did not retract the affidavit because she believed Ms. Guzman had used the pre-signed prescriptions without her authorization. Although the Defendant was anxious during the meeting, the overall tone of the interview was polite, professional, and cordial. The meeting lasted one to two hours, and the parties parted on cordial terms.

Later in November 2009, Investigator Graham met with Ms. Guzman at Maryville Pain Management and seized a large quantity of controlled substances, some of which that had been

18

purchased using the Defendant's DEA registration number.  On November 25, 2009, Investigators

Graham and Houser returned to New Hope Pain Management clinic to meet with the Defendant.

The purpose of this meeting was to determine whether the Defendant knew that Ms. Guzman had

purchased controlled substances using the Defendant's DEA registration number and to review a

DEA Form 222.  The Defendant agreed to the meeting and led the investigators to her office.  The

Defendant and the investigators sat in the same places as they did on November 5th.  The Defendant

left the room several times during the meeting to attend to the operation of the clinic.  During the

interview, the Defendant denied having any knowledge of orders for controlled substances at

Maryville Pain Management and indicated that Ms. Guzman had placed the orders without the

Defendant's knowledge.  The Defendant also gave the investigators information on patient

misconduct.  The tone of the interview was cordial and the parties parted on amicable terms.


## IV.  ANALYSIS

The Fifth Amendment protects against a defendant being "compelled in any criminal

case to be a witness against himself."  In light of this protection, the Supreme Court has held that law

enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of

his or her rights under the Fifth Amendment.  <u>Miranda v. Arizona</u>, 384 U.S. 436, 478-79 (1966); <u>see

also</u> <u>United States v. Salvo</u>, 133 F.3d 943, 948 (6th Cir. 1998).  "Statements elicited in

noncompliance with this rule may not be admitted for certain purposes in a criminal trial."

<u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994); <u>Salvo</u>, 133 F.3d at 948.  The Defendant

challenges statements she gave investigators on October 29, November 5, and November 25, 2009,

because (1) the investigators failed to advise her of the <u>Miranda</u> warnings on these three occasions

and (2) because she did not give the November 5, 2009 statement knowingly or voluntarily.

## A. Unwarned Statements

The Defendant asks the Court to suppress the information she provided in three meetings with DEA Investigator David Graham because he failed to provide the Miranda warnings in any of these meetings. The obligation to administer Miranda warnings to suspects only arises if there has been "such a restriction on a person's freedom as to render him 'in custody.'" Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam). To determine whether an individual is in custody for purposes of Miranda, the Court examines the totality of the circumstances to assess how a reasonable person in that situation would have interpreted the situation. Salvo, 133 F.3d at 948; see also United States v. Swanson, 341 F.3d 524, 528 (6th Cir. 2003). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323; Mason v. Mitchell, 320 F.3d 604, 631 (6th Cir. 2003). The "'ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" United States v. Knox, 839 F.2d 285, 291 (6th Cir. 1988) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted); Swanson, 341 F.3d at 529.

In determining whether a defendant was in custody, the Court examines the totality of the circumstances to ascertain a reasonable person's understanding of the situation. Salvo, 133 F.3d at 948. Relevant to the inquiry is whether a reasonable individual in the same position as the defendant would have felt free to leave. Swanson, 341 F.3d at 529. Other factors useful in making this determination are:

20

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

Salvo, 133 F.3d at 950; see also Swanson, 341 F.3d at 529.

As an initial matter, the Court finds that despite the Defendant's allegations that she did not receive the Miranda warnings at meetings with Investigator Graham on October 29, November 5, and November 25, 2009, there was no testimony regarding whether the Miranda warnings were given at the October 29 and November 25 meetings. Nevertheless, the Court finds from the context of Investigator Graham and Investigator Houser's testimony that they did not advise the Defendant of the Miranda warnings at any of the three meetings. The question then becomes whether the Defendant was in custody during the interviews on October 29, November 5, and November 29, 2009. The Court examines each of the three meetings in light of the totality of the circumstances and the above-listed factors.

*(1) October 29, 2009 Meeting*

Based upon the totality of the circumstances, the Court finds that the Defendant was not in custody when she met with Investigator Graham and nurse practitioner Melvin Viney on October 29, 2009. The purpose of the questioning at this meeting was to determine if the Defendant had been the victim of someone forging her signature on prescriptions. The fact that Investigator Graham asked the Defendant to come to the conference room in the DEA offices does not

automatically render the meeting custodial.  See generally, California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam) (holding that law enforcement does not have to provide the Miranda warnings "simply because the questioning takes place in the station house"); Mason v. Mitchell, 320 F.3d 604, 631 (6th Cir. 2003) (reasoning that a defendant who voluntarily came to the police station for questioning was not in custody).  The Court has no evidence that the Defendant was intimidated by the location or circumstances of the meeting.  Instead, the account from Investigator Graham suggests that the Defendant was accommodating with regard to the requested meeting because she did not want her credentials marred by unauthorized use by another.  At the meeting, Investigator Graham did not ask many questions but, instead, permitted Mr. Viney to explain his concerns to the Defendant and the Defendant and Mr. Viney to discuss the prescriptions in question.  Although no formal statement or affidavit was produced, the Defendant took the position that her signature had been forged on the prescriptions.  The Court finds that no incriminating information was elicited from the Defendant at the October 29 meeting.  At the end of the one-hour-long meeting, the Defendant left freely.  Based upon the limited information provided at the suppression hearing on the circumstances and tone of the October 29th meeting, the Court finds that a reasonable person would have felt free to leave and that, accordingly, the meeting was not custodial.

*(2) The November 5, 2009 Meeting*

The main thrust of the Defendant's argument centers around the November 5, 2009 meeting at her office with Investigators Graham and Houser.  She argues that this meeting was custodial because the investigators (1) never told her that she was free to leave and, in fact, blocked her access to the door; (2) isolated her in her office by blocking access to the door, asking her to

unplug her telephone, and not permitting her access to counsel when she requested an attorney; (3) questioned her for nearly four hours without telling her whether she was being arrested or that she was free to leave; (4) used coercive tactics such as "playing good cop/bad cop," refusing to accept the answers she gave, and making aggressive and racist statements; and (5) ignored her prior request that Investigator Houser not be present for the meeting. The Government responds that the circumstances of the November 5th interview reveal that it was not custodial.

Examining the totality of the circumstances based upon the factors the Sixth Circuit set out in Salvo and Swanson, the Court finds that the Defendant was not in police custody during the November 5, 2009 meeting. The first factor looks to the purpose of the questioning. Salvo, 133 F.3d at 950; Swanson, 341 F.3d at 529. Both investigators testified that the purpose of meeting with the Defendant on November 5th was to determine whether her signature had been forged on prescriptions issued by Maryville Pain Management. Both investigators stated that they did not view the Defendant as being a target of their investigation but, instead, saw her as a victim or a complaining witness. The affidavit that Investigator Houser prepared on November 3rd in anticipation of the meeting supports this testimony.

Second, the Court examines "whether the place of the questioning was hostile or coercive[.]" Salvo, 133 F.3d at 950; see also Swanson, 341 F.3d at 529. The Defendant was interviewed in her private office at her place of business. The Sixth Circuit has twice analyzed the interview of a defendant at his or her place of employment. In United States v. Crossley, the defendant was interviewed in a large classroom with windows at the military camp where she worked. 224 F.3d 847, 862 (6th Cir. 2000). The appellate court determined that the location, which was "not a confined space which could be intimidating[,]" to be one factor supporting its

23

determination that the interview was noncustodial. Id. Similarly, in United States v. Mahan, the appellate court concluded that an employee questioned at his place of employment was not in custody. 190 F.3d 416, 422 (6th Cir. 1999). Initially, the Court observes that in the present case, the Defendant chose the location within her business at which the interview would occur and led the investigators to her office. Although the Court has little evidence about the layout of the Defendant's office, the Court finds that the Defendant sat across from the investigators with her desk in between them. The Court does not find that the location of the interview was intimidating.

Relying on two cases from the Ninth Circuit, the Defendant contends that her familiarity with her surroundings was negated by the investigators conduct in blocking the exit from her office and isolating her from others. See United States v. Kim, 292 F.3d 969, 977 (9th Cir. 2002) (determining that defendant was in custody when locked inside her store, while her husband was forced to remain outside); United States v. Beraun-Panez, 830 F.2d 127 (9th Cir. 1987) (order modifying opinion at 812 F.2d 578) (finding that defendant stopped on side of the road was in custody because his coworker was prevented from approaching him). In this case, the Court finds that the investigators did not block the door. Instead, both investigators testified that the Defendant left and returned several times during the meeting to attend to the business of the clinic. Presumably, the Defendant was able to interact with her coworkers and patients each time she left the office. The Court finds that the Defendant felt free to leave the interview because she did, in fact, leave more than once. The testimony at the suppression hearing also fails to support the Defendant's contention that the investigators ordered her to unplug her telephone. The Court finds that the location of the November 5th meeting was neither hostile, nor coercive.

24

The third relevant factor is the length of the interview. <u>Salvo</u>, 133 F.3d at 950; <u>Swanson</u>, 341 F.3d at 529. The Defendant argues that the four-hour interrogation, during which she did not know whether she would be arrested, was like a "'marathon session designed to force a confession.' <u>Davis v. Allsbrooks</u>, 788 F.2d 168, 171 (4th Cir. 1985)." [Doc. 65, p.3] The investigators testified that the November 5th meeting lasted between one and two hours and was interrupted at times for the Defendant to take care of the clinic. They stated that the tone of the interview was polite, professional, and cordial. The Defendant's allegations that the investigators made aggressive or racist remarks were not borne out by the testimony at the suppression hearing. Thus, the Court concludes that the length and tone of the meeting was not designed to force the Defendant to confess, especially in light of the evidence that both investigators were surprised by the Defendant's admission that she had pre-signed prescriptions.

Finally, the Court looks to whether the circumstances of the November 5th meeting reveal "other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions." <u>Salvo</u>, 133 F.3d at 950; <u>see also</u> <u>Swanson</u>, 341 F.3d at 529. As emphasized by the Defendant, there is no evidence that the investigators ever told the Defendant that she was free to end the interview at any time. Additionally, the Court finds that Investigator Graham contacted the Defendant to arrange the meeting and that he knew that she was less comfortable meeting with Investigator Houser than she was with him, although there is no evidence that the Defendant told Investigator Graham that she would not meet with him if

25

Investigator Houser was present. Nevertheless, the Defendant agreed to the meeting when the investigators arrived at the clinic, chose to meet with the investigators in her private office, and freely left the room several times during the interview. Moreover, the testimony at the suppression hearing shows that Investigator Houser, with whom the Defendant did not have the same rapport as Investigator Graham, viewed the Defendant as a victim rather than a perpetrator and attempted to alleviate any anxiety the Defendant might have felt by preparing an affidavit for her before the meeting.

Based upon the totality of the circumstances, the Court finds that the Defendant was not in custody when she was interviewed by Investigators Graham and Houser on November 5, 2009. Accordingly, the Miranda warnings were not required.

*(3) November 25, 2009 Meeting*

The Defendant contends that she should have been advised of the Miranda warnings when she met with Investigators Graham and Houser on November 25, 2009. The Court finds this meeting to be very similar to the November 5th meeting in location, circumstances, and tone. The same investigators met with the Defendant in her office sitting across from her as before. The Defendant was again unrestrained in her freedom of movement, leaving the room several times to attend to the business of the clinic. The tone of the meeting was again cordial. The November 25th meeting differs from the November 5th meeting in that it does not appear to have been prearranged and the affidavit that the Defendant created at this interview was handwritten [see Doc. 64, Exh. 3],[2]

---

[2]While the parties did not make the November 25, 2009 affidavit an exhibit to the suppression hearing, the Defendant included it as an exhibit to her motion. The affidavit contains nothing overtly incriminating to the Defendant.

rather than drafted prior to the meeting. Also, the purpose of the November 25th meeting was to determine whether the Defendant had authorized the acquisition of the controlled substances that Investigator Graham seized from Maryville Pain Management in November 2009. The Court finds that none of these differences would cause a reasonable person to believe that they could not refuse the meeting.

The main difference in the November 5th meeting and the November 25th meeting was that the investigators and the Defendant knew that the Defendant had already admitted to pre-signing blank prescriptions while she was employed at Maryville Pain Management. The Court finds that this difference–the investigators' knowledge that the Defendant could be facing criminal liability or, at least, was in violation of administrative regulations–did not alone make the November 25th meeting custodial. Our appellate court examined this question in the context of a defendant reentering the country, who was subject to questioning and a "secondary inspection" by Customs Service officers after a drug detection dog alerted on his baggage. United States v. Galloway, 316 F.3d 624, 630 (6th Cir. 2003). Although the court ultimately based its determination that no Miranda warnings were required upon case law holding that routine customs inspections are not custodial, it prefaced this holding with the maxim that

> the fact that an interrogation is not random, but focused on a particular defendant, does not automatically render it custodial. See Oregon v. Mathiason, 429 U.S. 492, 494 . . . (1977) (per curiam) (stating "[n]or is the requirement of warnings to be imposed simply because . . . the questioned person is one whom the police suspect"); Beckwith v. United States, 425 U.S. 341, 346–47 . . . (1976) (stating it "was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the Court to impose the Miranda requirements with regard to custodial questioning"). The totality of the circumstances must be examined to determine whether

27

> there was a "formal arrest or restraint on freedom of movement of the
> degree associated with a formal arrest." Thompson v. Keohane, 516
> U.S. 99, 112 . . . (1995).

Id. Accordingly, the fact that the instant Defendant may have been suspected of criminal activity is only one circumstance to consider in evaluating the totality of the circumstances. In light of the cordial tone of the November 25th meeting, the fact that the Defendant could come and go freely from her office during the interview, and the fact that the purpose of the meeting was to question the Defendant about another individual's potential misuse of her DEA registration number (rather than about a matter incriminating to the Defendant), the Court finds that the November 25th meeting was also non-custodial, even considering the Defendant's admission on November 5th.

The Court finds that the Defendant was not in custody at any of the three interviews in question. It is well-settled that a person is not entitled to be advised of the Miranda warnings when questioned in a noncustodial setting. United States v. Warner, 971 F.2d 1189, 1201 (6th Cir. 1992) (holding that a statement was admissible despite the absence of Miranda warnings because the suspect was not in custody when interrogated). Accordingly, the Court finds that the investigators were not required to advise the Defendant of the Miranda warnings at the meetings on October 29, November 5, or November 25, 2009.

### B. Voluntariness

In addition to objecting to the unwarned nature of his statements, the Defendant argues that his statements should be suppressed because the investigator's interrogation of her at the November 5, 2009 meeting "was psychologically overbearing and led the foreign born citizen to involuntarily answer." [Doc. 65, p.5] The Court views this to be an argument that the November 5th

28

statement was not knowingly and voluntary made.

The concern over a coerced confession stems from both the Fifth Amendment's protection against forced self incrimination and also the Due Process clause. Dickerson v. United States, 530 U.S. 428, 432-34 (2000) (observing that the Court has "never abandoned this due process jurisprudence, and thus continue to exclude confessions that were obtained involuntarily"). "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry. But . . . '[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was "compelled" despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.'" Id. at 444 (quoting Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984)). As discussed above, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'" Connelly, 479 U.S. at 167. Moreover, the coercive police activity must be the primary motivation for the Defendant's decision to give the statement before suppression of the statement is warranted. McCall, 863 F.2d at 459 (citing Connelly, 479 U.S. at 163-64).

In the present case, the Defendant contends that the investigators engaged in coercive "psychological attack" upon her that consisted of (1) "playing good cop/bad cop," (2) refusing to accept her answers until she gave the information they sought, (3) isolating her from the outside world by blocking her access to the door and her use of the telephone, and (4) making aggressive and racist statements that she should plan to move to India because she would no longer have a nursing license in this country. The Court finds that the testimony at the suppression hearing does not support these allegations. First, Investigator Graham and Investigator Houser both testified that they viewed the Defendant to be a complainant or a victim when they came for the November 5th

29

meeting. There is no indication that either investigator played the role of "bad cop" or refused to accept the information given by the Defendant. The Court notes that the Defendant had already acknowledged that the bulk of the signatures on the prescriptions were hers before Investigator Graham asked her to sign her name multiple times to show the minor variations in her signatures. Moreover, both investigators stated they were surprised by the Defendant's admission that she had pre-signed blank prescriptions. Investigator Graham stated that he had not considered the pre-signing of blank prescriptions to be a possibility before the Defendant admitted to it on November 5th. The Court has already found above that the Defendant was not isolated in her office or ordered to unplug her telephone but, instead, that she was able to come and go from her office freely while she oversaw the clinic. Finally, the investigators both denied that any racist remarks were made during the interview. Accordingly, the Court finds that the Defendant cannot show any coercive conduct on the part of Investigators Graham and Houser.

The Defendant also suggests that the November 5th statement was involuntary because she was emotionally shaken and because English was not her native language. First, the evidence also belies these contentions. Although Investigator Houser stated that the Defendant tends to become anxious during investigatory meetings and was, in fact, anxious at the November 5th meeting, she also testified that the Defendant seemed relieved to explain what had happened with the pre-signed prescriptions. Investigator Graham denied that the Defendant was emotional or "visibly shaken" by the end of the meeting. Instead, he stated that he and the Defendant parted on cordial terms. Also, Investigator Graham testified that the Defendant speaks fluent English, had no difficulty understanding him on November 5th, and that he had never had any trouble communicating with the Defendant in English. Moreover, "[e]vidence that a defendant suffered, at

30

the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." <u>United States v. Newman</u>, 889 F.2d 88, 94 (6th Cir. 1989). As discussed above, the Defendant points to no evidence of coercion on the part of Investigators Graham and Houser. Thus, the Court finds that the Defendant's statements to Investigators Graham and Houser on November 5, 2009, were voluntarily made.

## V. CONCLUSION

After carefully considering the motions, memoranda, testimony, and exhibits and after reviewing the relevant legal authorities, the Court finds that Defendant Wright's statements on October 29, November 5, and November 25, 2009, were not custodial. Accordingly, the Court finds that Defendant Wright's Fifth Amendment rights were not violated by the investigators' failure to advise her of the <u>Miranda</u> warnings. Additionally, the Court finds that the Defendnat's November 5, 2009 statement was voluntarily given. For the reasons set forth herein, it is **RECOMMENDED**

31

that the Motion to Suppress Defendant Wright's Statements Regarding Pre-signed Prescriptions

[**Doc. 64**] be **DENIED**.[3]

Respectfully submitted,

    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[3]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).